**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 24-1388

DELMARVA FISHERIES ASSOCIATION, INC.; MARYLAND CHARTER BOAT ASSOCIATION, INC.; BRIAN NESSPOR; KENNETH JEFFRIES, JR.,

    Plaintiffs – Appellants,

v.

ATLANTIC STATES MARINE FISHERIES COMMISSION,

    Defendant – Appellee.

Appeal from the United States District Court for the District of Maryland, at Baltimore. Richard D. Bennett, Senior District Judge. (1:24–cv–00688–RDB)

Argued: December 11, 2024　　　　　　　　　　　　　　　　Decided: February 4, 2025

Before WYNN and THACKER, Circuit Judges, and FLOYD, Senior Circuit Judge.

Vacated and remanded with instructions by published opinion. Judge Wynn wrote the opinion, in which Judge Thacker and Senior Judge Floyd joined.

**ARGUED:** James J. Butera, MEEKS, BUTERA & ISRAEL PLLC, Washington, D.C., for Appellants. Sean H. Donahue, DONAHUE, GOLDBERG & HERZOG, Washington, D.C., for Appellee. **ON BRIEF:** Andrew C. Meehan, MACLEOD LAW GROUP, LLC, Chestertown, Maryland, for Appellants. Keri S. Davidson, DONAHUE, GOLDBERG & HERZOG, Washington, D.C., for Appellee.

WYNN, Circuit Judge:

Plaintiffs, a group of charter-boat operators and trade associations operating in Maryland, sued the Atlantic States Marine Fisheries Commission in federal district court to enjoin the Commission's striped-bass plan. The Commission, which was formed in 1942 pursuant to an interstate compact, recommends fishery management plans to its member states. The court denied Plaintiffs' motion for a preliminary injunction in part because it found that Plaintiffs likely lacked standing to enjoin the plan.

We conclude that Plaintiffs lack standing because they are regulated by Maryland, not by the Commission, and Plaintiffs made no allegation that enjoining the Commission's recommended plan would likely cause Maryland to rescind its own regulations. And even if they had, they would have needed to bolster that allegation with specific reasons supporting it, as Maryland adopted stricter measures than the plan called for.

Because Plaintiffs lack standing to pursue an injunction of the striped-bass plan—which is the only relief they seek—we remand with instructions to dismiss the case.

I.

A.

The abundance of the Atlantic striped bass (also known as rockfish) once "astonished the early [European] settlers in New England." John C. Pearson, *The Life History of the Striped Bass, or Rockfish,* Roccus Saxatilis *(Walbaum)*, 49 Bull. Bureau Fisheries 825, 825 (1938). In 1614, Captain John Smith wrote that he saw so many striped bass in the Chesapeake Bay "that it seemed to me that one mighte go over their backs drisho'd [dry-shoed]." Dick Russell, *Striper Wars: An American Fish Story* 13 (2005). In

2

1623, the Plymouth settlers used their last boat and a single net to catch enough striped bass to feed themselves through autumn. *Id.* at 14. Roger Williams recounted that the Narragansett Indians called striped bass *missuckeke-kequock*, which meant "much fish" or "great fish." *Id.* at 13.

Despite the abundance of striped bass, colonial Americans recognized that their supply was finite. Pearson, *supra*, at 825–26. In 1625, Massachusetts prohibited using any bass as fertilizer—likely the first statutory conservation measure in colonial America. *Id.* Anxiety regarding overfishing intensified in the nineteenth century. Robert B. Roosevelt warned in 1870 that "the insatiable maw of the New York market" had seriously degraded the striped-bass population. Russell, *Striper Wars* 16. His nephew, President Theodore Roosevelt, fished for striped bass from the "bass stands" of Cuttyhunk Island, Massachusetts, in the early 1900s but found that the fish's population "had been reduced to extremely low levels." *Id.*

Motivated in part by the decline of the striped bass, the fourteen Atlantic coastal states and Pennsylvania formed an interstate compact in 1940 to coordinate fishery management measures. *See* Atlantic States Marine Fisheries Compact, Pub. L. No. 77-539, ch. 283, 56 Stat. 267, 267 (1942) [hereinafter Compact], *amended by* Pub. L. No. 81-721, 64 Stat. 467 (1950). Congress approved the agreement via the Constitution's Compact Clause, and the Atlantic States Marine Fisheries Commission was created. *Id.*; *see* U.S. Const. art. I, § 10, cl. 3.

The Commission, which is composed of three representatives per state, does not regulate states or individuals; rather, it "recommend[s]" regulations to the compacting

3

states. Compact, Art. IV, 56 Stat. 268. The Compact neither "limit[s] the powers of any signatory state" nor prevents states from "imposing additional conditions" beyond the Commission's recommendations. *Id.* Art. IX, 56 Stat. 269. States may leave the Commission for any reason by providing six months' notice. *Id.* Art. XII, 56 Stat. 269.

Despite the Commission's efforts, striped-bass populations continued to decline throughout the twentieth century. Russell, *Striper Wars* 17–18. New power boats equipped with radar and sonar caught swaths of striped bass, and recreational angling increased exponentially in the 1970s. *Id.* In 1979, Congress ordered an emergency striped-bass research survey, *see* Act of Nov. 16, 1979, Pub. L. 96-118, 93 Stat. 859, 860, which found a precipitous decline in striped-bass survival in the preceding decade such that "too few young survive to replace their parents," U.S. Fish & Wildlife Serv., Dep't of the Interior & Nat'l Marine Fisheries Serv., Dep't of Com., *Emergency Striped Bass Research Study: 1981 Annual Report* 11.

Concluding that striped-bass stocks "have been severely reduced," Congress strengthened the Commission's hand in 1984 by enacting the Atlantic Striped Bass Conservation Act, Pub. L. No. 98-613, § 2, 98 Stat. 3187, 3187 (1984) [hereinafter Bass Act] (codified as amended at 16 U.S.C. § 5151 et seq.). The Bass Act created a federal enforcement mechanism for Commission recommendations. Under the Bass Act, if the Commission finds that a state failed to adopt measures consistent with its striped-bass plans, it reports that finding to the Secretaries of Commerce and Interior. 16 U.S.C. § 5153(a), (c). If they agree with the Commission's finding, the Secretaries must impose a

4

moratorium on striped-bass fishing in that state's waters until the state remedies its failure. *Id.* §§ 5152(9), 5154(a).[1]

This approach soon proved effective. The first Commission plan under the Bass Act called for states to implement conservation measures such as minimum size limits. Atl. States Marine Fisheries Comm'n, *Fishery Management Report: Amendment 3 to the Interstate Fishery Management Plan for the Atlantic Striped Bass* (1985). Some states— including Maryland—went further by imposing a total moratorium on striped-bass fishing. Atl. States Marine Fisheries Comm'n, *Forging Knowledge into Change* 52 (2017). In 1995, the Commission "declared coastal and Chesapeake Bay striped bass stocks restored." *Id.* at 53. "The resurgence of striped bass along the eastern coast of the U.S. is probably the best example in the world of a species that was allowed to recoup through tough management and an intelligent rebuilding plan." Carl Safina, *The World's Imperiled Fish*, Sci. Am. Nov. 1995, at 46, 53.

B.

But striped bass were still not off the hook. The Commission's 2019 benchmark assessment found the striped-bass stock once again to be "overfished and experiencing

---

[1] In 1993, Congress applied this approach to all other species of Atlantic fish. Atlantic Coastal Fisheries Cooperative Management Act, Pub. L. No. 103-206, 107 Stat. 2447 (1993) (codified as amended at 16 U.S.C. § 5101 et seq.).

5

overfishing."[2] Atl. States Marine Fisheries Comm'n, *Addendum VI to Amendment 6 to the Atlantic Striped Bass Interstate Fishery Management Plan* § 1.0 (2019).

So, in 2019, the Commission amended its striped-bass plan to rebuild populations "no later than 2029," and permitted the Striped Bass Management Board[3] to quickly amend the plan further in response to future stock assessments. Atl. States Marine Fisheries Comm'n, *Amendment 7 to the Interstate Fishery Management Plan for Atlantic Striped Bass* §§ 4.4, 4.7 (2022). Striped-bass populations seemed to stabilize, and in 2021, the Commission's data indicated a "very high chance" of rebuilding striped-bass stocks to the target level by 2029. Atl. States Marine Fisheries Comm'n, *Addendum II to Amendment 7 to the Atlantic Striped Bass Interstate Fishery Management Plan for Atlantic Sea Bass* § 2.2.2 [hereinafter *Addendum II*].

That changed in 2022 when the Commission found that recreational harvest of striped bass had increased *eighty-eight percent* from the previous year (while commercial removals remained steady). *Id.* § 2.2.1. The Commission's new projections showed that, without action, there was only a fifteen percent chance of rebuilding striped-bass stocks by 2029. *Id.* The Striped Bass Management Board undertook to amend the 2019 plan, using the procedures contained in that plan. After holding fifteen public hearings and receiving

---

[2] "Overfished" means that the stock of fish is currently below a sustainable level, while "experiencing overfishing" means that the rate of fishing is above a sustainable level. Atl. States Marine Fisheries Comm'n, *Fisheries Science 101*, https://asmfc.org/fisheries-science/fisheries-science-101 [https://perma.cc/QH8F-9D47].

[3] The Commission has a management board—essentially a subcommittee—for each species within its jurisdiction. Atl. States Marine Fisheries Comm'n, Interstate Fisheries Management Program Charter [hereinafter Charter] § 4.

2,832 written public comments, the Management Board promulgated Addendum II, the target of this lawsuit. Atl. States Marine Fisheries Comm'n, *Proceedings of the Atlantic Striped Bass Management Board Meeting—January 2024*, at 5 [hereinafter *Board Minutes*].

Among other measures, Addendum II recommended limiting the customers of Maryland charter boats to keeping one striped bass per day starting in 2024, down from two. *Addendum II* § 3.1.1. Private boats and shore fishers were already subject to a one-fish limit for striped bass, as were nearly all charter boats in states other than Maryland. *See* Atl. States Marine Fisheries Comm'n, *Review of the Interstate Fishery Management Plan for Atlantic Striped Bass: 2022 Fishing Year* 23–25 (2024).

One of Maryland's three Commission representatives moved to delay the one-fish limit for an additional year, and to instead "implement" the limit on January 1, 2025, "so that our businesses can plan for the change that will be coming." *Board Minutes* at 28, 30. A representative from New Hampshire opposed the motion because "what we're trying to do here is to reduce the removals *in 2024* by 14.5 percent," but the Maryland representative's proposed solution "would have [only] an 11 percent reduction, and so it doesn't get us to where we need to be in 2024." *Id.* at 29 (emphasis added). The motion failed. *Id.* at 30. Maryland's representatives then voted against including the one-fish limit in Addendum II at all, but the limit was approved. *Id.* at 32. Finally, Maryland's representatives voted against Addendum II as a whole, but it was approved. *Id.* at 52.

Maryland's representatives did not exercise their authority to appeal the one-fish limit or Addendum II to the Commission. *See* Charter § 4(h). And—despite a request from

7

Plaintiffs—Maryland's Attorney General did not sue to enjoin the plan in court. Opening Br. at 30–31; *see New York v. Atl. States Marine Fisheries Comm'n*, 609 F.3d 524, 536 (2d Cir. 2010) ("[M]ember states may seek judicial relief to enforce rights under the [Compact].").

Following the Commission's adoption of Addendum II, the Maryland Department of Natural Resources quickly moved to implement emergency regulations in accordance with the plan, including limiting the customers of charter boats to keeping one striped bass per day. *Maryland Enacts Striped Bass Emergency Regulations to Increase Protections for the Spawning Population*, Md. Dep't of Nat. Res. (Feb. 9, 2024), https://news.maryland.gov/dnr/2024/02/09/maryland-enacts-striped-bass-emergency-regulations-to-increase-protections-for-the-spawning-population/ [https://perma.cc/F7BY-RE5C]. Its proposed regulations also imposed additional measures beyond those required by Addendum II, including cancelling the Spring 2024 striped-bass trophy-fishing season. *Id.* The Department expressed concern that in 2023, "Maryland's annual striped bass young-of-year index, which tracks reproductive success, was 1.0, well below the long-term average of 11.1." *Id.* The Maryland General Assembly's Joint Committee on Administrative, Executive, and Legislative Review approved the emergency regulations. Md. Code Regs. 08.02.15.09 (2024). The emergency regulations took effect on February 9, 2024, and lasted through June 15, 2024; the Department of Natural Resources permanently adopted them on November 25, 2024. *Id.*

8

C.

Plaintiffs are a fisheries trade association, a professional group of charter-boat captains, and two individuals (a commercial fisherman and a charter-boat captain). In March 2024, Plaintiffs sued the Commission in federal district court. Their complaint brought due-process and takings claims under the federal Constitution and related claims under the Maryland Constitution and 42 U.S.C. § 1983. Plaintiffs sought an "order and judgment holding unlawful, enjoining, and setting aside [Addendum II]." J.A. 26. Soon after, Plaintiffs moved for a preliminary injunction against Addendum II. They provided declarations alleging serious economic harm, including that Addendum II is "the tipping point that will unquestionably force good businesses to close their doors." J.A. 60.

After a hearing, the district court denied Plaintiffs' preliminary-injunction motion, finding that Plaintiffs were unlikely to succeed on the merits of their claims. The court primarily concluded that Plaintiffs likely lacked standing, as their alleged injuries were not likely to be redressed by an injunction against Addendum II. The court found it was "unlikely that enjoining the addendum will have any impact on Maryland's decision to enact regulations in conformity with the addendum." *Delmarva Fisheries Ass'n v. Atl. States Marine Fisheries Comm'n*, No. 24-cv-688, 2024 WL 1721066, at *3 (D. Md. Apr. 22, 2024).

The district court further concluded that, even if Plaintiffs had standing to sue, they did not plausibly state a claim for relief. The court noted that "Addendum II was issued after a thorough deliberative process in which the State of Maryland participated, and Plaintiffs had notice and opportunity to comment on its measures." *Id.* And it found it

9

unlikely that Plaintiffs even had an available cause of action under Section 1983, "as the Commission is not a 'person' within the meaning of the statute, it does not act under 'color of state law,' and Congress did not intend to create a private remedy authorizing private parties to bring federal court actions challenging the Commission's fishery planning decisions." *Id.* (quoting 42 U.S.C. § 1983). The court therefore did not reach the other preliminary-injunction factors.

Plaintiffs timely appealed.

II.

Although we have jurisdiction to review a district court's denial of a preliminary injunction under 28 U.S.C. § 1292(a)(1), we must first ask if Plaintiffs have standing to sue at all. *Adams Outdoor Advert. Ltd. P'ship v. Beaufort County*, 105 F.4th 554, 565–66 (4th Cir. 2024) ("Federal courts are required to ensure that they have jurisdiction and must address standing problems even when the parties do not raise them.").

The district court found that Plaintiffs failed to show it was likely that they had standing, so the court denied their motion for preliminary injunction. We conclude that we are required to go further: because Plaintiffs' complaint fails to plausibly plead the elements of standing, the federal courts lack jurisdiction to consider their request for a preliminary injunction (or any other relief) at all, so we remand with instructions to dismiss.

If a plaintiff fails to plausibly allege the elements of standing in their complaint, federal courts do not have jurisdiction over their claims. *Bishop v. Bartlett*, 575 F.3d 419, 424 (4th Cir. 2009) ("[T]he party invoking the jurisdiction of the court must include the necessary factual allegations in the pleading, or else the case must be dismissed for lack of

10

standing." (citing *McNutt v. Gen. Motors Acceptance Corp.*, 298 U.S. 178, 189 (1936))); *see Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) ("Where, as here, a case is at the pleading stage, the plaintiff must clearly . . . allege facts demonstrating each element." (internal quotation marks omitted)). When we determine that the federal courts lack jurisdiction over a matter, we must remand with instructions to dismiss—even when reviewing a preliminary injunction. *See, e.g.*, *Gallanosa ex rel. Gallanosa v. United States*, 785 F.2d 116, 121 (4th Cir. 1986) ("Because we find the Virginia district court lacked jurisdiction, we vacate the entry of the preliminary injunction and remand with instructions to dismiss the action."). In such a case, we retain jurisdiction on appeal "merely for the purpose of correcting the error of the lower court in entertaining the suit." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 95 (1998) (quotation marks omitted).

In contrast, when plaintiffs meet their burden to establish standing for purposes of the *pleading* stage but fail to show a substantial likelihood of success on the merits—including when they fail to show a substantial likelihood that they have standing—we affirm the denial of the preliminary injunction but allow the case to progress as usual below, rather than remanding with instructions to dismiss for lack of standing. *See Elec. Priv. Info. Ctr. v. U.S. Dep't of Com.*, 928 F.3d 95, 104 (D.C. Cir. 2019) (explaining that it is appropriate to affirm the denial of a preliminary injunction if a plaintiff fails to "establish[] a substantial likelihood of standing" at the preliminary injunction stage, but that it is appropriate to remand with instructions to dismiss if a plaintiff "cannot establish standing *as a matter of law*" (internal quotation marks omitted)); *see also Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) ("[E]ach element [of standing] must be supported in the

11

same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation.").

We conclude that Plaintiffs have not carried their burden to establish standing even at the pleading stage, so we will vacate and remand for dismissal for lack of jurisdiction.

For a plaintiff to have standing to sue, Article III requires that they "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo*, 578 U.S. at 338 (citing *Lujan*, 504 U.S. at 560–61). Here, Plaintiffs allege that "the consequence" of Addendum II's one-fish bag limit "will be to . . . reduce [charter boat's] business revenue by an estimated 50–65 percent." J.A. 9. Plaintiffs maintain that the Commission "coerc[ed]" Maryland into implementing its striped-bass regulations, which in turn injured Plaintiffs. Opening Br. at 53. They ask for an order "holding unlawful, enjoining, and setting aside" Addendum II. J.A. 26.

Plaintiffs sued the Commission, not Maryland. But they are regulated by Maryland, not the Commission.[4] So, to have standing to enjoin the Commission's actions, Plaintiffs must show that doing so will change how Maryland regulates them. Where choices by an "independent actor[]" are involved—here, the sovereign state of Maryland—Plaintiffs face the "difficult" burden of showing how Maryland would respond if the Commission's

---

[4] Plaintiffs also argue, without support, that the Commission "directly regulate[s]" them. Opening Br. at 18. But the Commission "recommend[s]" regulations to states. Compact, Art. IV, 56 Stat. 268. It does not itself promulgate regulations or otherwise bind individuals.

12

Addendum II were enjoined. *Lujan*, 504 U.S. at 562. In other words, Plaintiffs must plausibly allege that Maryland would likely rescind its one-fish limit on charter boats if the district court enjoined Addendum II. They have not done so.

First, Plaintiffs' allegation that the Commission coerced Maryland to enact the regulations that are allegedly causing them harm is unpersuasive. Maryland voluntarily entered the Commission and may withdraw for any reason. Compact, Art. XII, 56 Stat. 269. As the Commission has authority to recommend plans only to its "member states," Atl. States Marine Fisheries Comm'n, *Rules and Regulations*, Art. I § 2 (1942) (amended 2016), only member states are subject to Bass Act penalties for noncompliance with Commission plans, *see* 16 U.S.C. §§ 5152–5154. And taking a step back, Maryland has collaborated with the other states in the Commission for over eighty years to preserve critical fisheries in the Chesapeake Bay and the Atlantic Ocean. As with any collaboration, sometimes Maryland takes and sometimes it gives. But it would probably surprise Maryland to hear that it has been coerced.

Second, even if Plaintiffs could establish that the Commission did "coerce" Maryland to adopt the regulations, they would still need to plausibly allege that Maryland would opt to *rescind* its duly enacted regulations if Addendum II were enjoined. When Plaintiffs' "asserted injury arises from" the Commission's alleged coercion "of *someone else*," it becomes the "burden of the plaintiff to adduce facts showing that those choices have been or will be made in such manner as to . . . permit redressability of injury." *Lujan*, 504 U.S. at 562. But Plaintiffs fail to even *allege* that Maryland would likely repeal its regulations if Addendum II were enjoined. And even if they had made that bare allegation,

13

they would have needed to provide an explanation given that Maryland chose to adopt regulations *more* stringent than Addendum II's recommendations.

In sum, Plaintiffs have not plausibly alleged that Maryland is likely to repeal its striped-bass regulations if Addendum II were to be enjoined. So Plaintiffs lack standing as they have failed to plead facts showing that an injunction of Addendum II would likely redress their injuries. Accordingly, we must instruct the district court to dismiss this case.

### III.

Because Plaintiffs lack standing to sue the Commission, we vacate the district court's order denying the preliminary injunction and remand with instructions to dismiss this action.

*VACATED AND REMANDED*<br>*WITH INSTRUCTIONS*